The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. Good afternoon. We're here on People v. Donnell Alan Taylor. That's case number 4-2-2-1-0-2-2. Appearing for the appellant is Austin M. Wright. Appearing for the appellee is Mr. James Ryan Williams. Mr. Wright, are you ready to proceed? Yes, Your Honor. Please do so. Thank you. Good afternoon, Your Honors. Good afternoon, counsel. My name is Austin Wright. I'm appearing on behalf of Donnell Taylor. Just as an offensive lineman must shield his quarterback from a blitzing linebacker, so too must an objectively reasonable defense attorney shield his client from prosecutorial onslaught. In either role, the work involved might not be flashy. In fact, more often than not, it involves doing the sort of nitty-gritty work that will go unnoticed. But the expectation remains the same. Do the work so that you can protect your guy. In this case, the state brought to bear a fairly significant amount of resources designed to portray Donnell as the puppet master behind an illegal drug outfit. And in the face of that onslaught, counsel did not do the work necessary to defend Donnell. First, he did not seriously scrutinize the search warrant complaint that Detective Schrebing filed. When it comes to the Fourth Amendment, particularity is the name of the game, which means that there must be a nexus between the place searched and the evidence sought. So had counsel seriously scrutinized the complaint in this case, it would have become apparent that there was no such nexus. I think a helpful way to frame the absence of relevant facts is to look at the way that the state in this appeal distinguishes Manzo. So first, the state said that Mr. Taylor was involved in arranging or executing each of the five controlled transactions at issue in this case. Well, that's not true. We need to just look at January 25th, January 24th, and January 17th to see that there's no allegation of direct arrangement or involvement by Mr. Taylor, which leads into the next thing. The state says that three of the five transactions occurred at Mr. Taylor's apartment. There was no allegation that Donnell Taylor resided at apartment seven. The only person associated with that apartment was Tiki Bias Sims. And what we're left with then is really only one sale occurred in proximity to Springfield Road, and that involved Mr. Samon. And a majority of Mr. Samon's activities occurred out on Orchard Road, which is why the state next says that, well, Mr. Samon and Mr. Taylor, they were close friends and they coordinated for the controlled buys. Well, the closeness or lack thereof of their relationship is not dispositive. And again, the only allegation related to sort of coordination between the two occurs on January 12th, when we see Mr. Samon go to Orchard Road to sell breadcrumbs to Sharon Williams. So next, the state says, recognizing how Eric Samon is the one most implicated in all the activity in this case, the state says that Eric Samon regularly visited Mr. Taylor's apartment. Again, it was not Mr. Taylor's apartment. There was no allegation of that. And what we're left with is proximity. We see that Mr. Samon was in the area of apartment seven one time, well, two times, but he was only directly tied to that apartment on January 25th. But we know from Manzo that simply leaving a residence and then later appearing at a drug sale is insufficient. There has to be more. In Manzo, even the target of that investigation not only left the residence, he drove a vehicle tied to that, registered to that residence. He was a known associate of the resident of that house, and that was insufficient. And so taken together, all that demonstrates that council performed efficiently by not filing a motion to suppress evidence because such a motion would have been meritorious. Which sort of gets us into what I imagine the crux of the issue is here, at least with respect to the motion to suppress, is that Donnell was prejudiced most clearly from council's failure in that the fruits of that illegal search would have been seized had, or I'm sorry, the fruits of that illegal search would have been suppressed had council filed the motion to suppress evidence. Here the state essentially says the good faith exception would have applied because the complaint and the attachments totaled about 20 pages. So Detective Shreveman necessarily had to have had a good faith belief that he submitted enough in the way of documentation to establish probable cause for the warrant. But that's not quite right. When we're analyzing whether or not there was a sufficient nexus or basis to issue the warrant, we have to look at only those facts that are specifically tied to the residence and the illegal activity. We can't give credit to puffery and just adding in other allegations to beef up the actual length of the complaint. And so, as I've discussed already, Detective Shreveman did not supply anything tying Apartment 7 to illegal drug activity. So he could not have harbored an good faith belief that he had supplied enough, which makes the exclusionary rule applicable. The good faith exception does not apply. And Donnell was therefore prejudiced by council's failure to file a motion to suppress evidence. Counselor, didn't the Supreme Court in Manzo cite the Massachusetts case, Commonwealth v. Clagon, C-L-A-G-O-N? My most clear recollection of Manzo in its citation and its analysis of good faith exception relates to really looking at Leon and note 24 there where it sort of discussed. So I can't say off the top of my head whether Manzo in its analysis cited the Massachusetts case. I would just say that its analysis was consistent with Leon and Leon's application of the good faith exception. And so, if there are no further questions on the motion to suppress issue, I'd next like to address counsel's failure to shield Donnell when he allowed the jurors to be instructed to substantively consider irrelevant instances of past misconduct for purposes of identity. Pre-trial, the state filed a motion to eliminate to ensure that it would be able to admit evidence from the mall. And then the state followed through on that plan. But at all times, it was evident that the testimony the state wanted to admit did not implicate other crimes concerns. They just wanted Officer McCall to testify. Yes, I ran into Donnell at the mall. This is a picture of what he looked like. That's it. Nevertheless, counsel then elicited that Donnell was on parole at the time of the January 7th transaction that he was actually taken into custody on that same day and then had no objection whatsoever to IPI 3.14 being given. All he ever objected to was simply your honor, just give it at the end of the case. Don't instruct the jurors after the witnesses testified. Excuse me, counsel. Go ahead, justice. I guess my question though is counsel's decision to elicit that testimony. Could that not have been strategy to establish that he did not have any drugs on him later in the day? So, he had already elicited that testimony from counsel. But once he elicited that testimony, wouldn't it be reasonable then for IPI 3.14 to have been given to assist in minimizing any prejudice to the defendant? I don't see how IPI 3.14 being given minimize the prejudice. If anything, it heightened it because it specifically told the jurors to consider that irrelevant evidence for an improper purpose. It wasn't, this isn't the sort of other crimes evidence that showed it was sort of a signature crime or that or any other sort of hallmark identity modus operandi issue. And so, it may be counsel another, you could say another reasonable trial strategy of his would have been, well, I just don't want to draw attention to this testimony. But if that were the case, why did he end his cross-examination right after that question? The jurors are necessarily going to recall the last thing that was said or in any event, there was no reasonable trial. I thought it was emphasized not only was he searched in your client and did not have any drugs on his person, but he also didn't have any money, buy money tied to the former transactions. And that would seem like a legitimate strategy on the part of defense counsel, point that out to the jury. Correct, your honor. I don't think counsel's performance would have been objectively unreasonable had he stopped at the point where he had already established these things about Mr. that he wasn't ultimately charged with a crime related to the mall, that he didn't have any buy money on him. It's that after the fact, he doubled down on this question for really no strategic purpose. And so then if he was surprised by that answer, he got why he took no corrective action. And maybe he didn't take corrective action because he didn't want to draw the juror's attention to it. That might be fair, but then to specifically allow the jurors to be instructed to consider that evidence is what was so deficient. It's not necessarily the questions, it's the repetition and the series of events that occurred. And counsel's performance in this regard, absolutely prejudiced Donnell. And that's because the state did not clearly identify the seller of it on January 7th, as he left Sharon Williams's apartment, and it didn't identify him when he was in there. So this court doesn't really need to take my word for it, that additional evidence was needed to establish who the identity of the seller was. We just need to look at how the state presented its case and prepared its case. It went through the trouble pretrial to file a motion and eliminate to ensure that evidence from the mall would be admissible. And then it presented that evidence to the jury, and then it consistently argued that evidence. And so the state needed the jurors to believe because it hadn't identified the seller when he was leaving the apartment, that if Donnell wore the same outfit at the mall that he wore at the gas station, then ipso facto, he was the seller. And given the absence of a clear identification, this is sort of a tenuous chain of identification. And it only became all the more easy for the jurors to believe when they were instructed, not only that Donnell had this other crimes evidence against him, but also when the jurors were allowed to consider through counsel's deficiency that not only did Donnell supposedly commit these other crimes, but he had in fact possessed drugs in apartment seven with an intent to deliver. It made it all the more likely and believable for the jurors in considering whether or not Donnell was the seller. If we remove this evidence that's irrelevant, inflammatory, and improper, and we look at what we're left with to substantiate Donnell's identity, we have essentially the testimony of Sharon Williams, who is a paid police informant with a documented addiction to crack cocaine that persisted until the time of this case. She testified that her crack usage had persisted even to January 2022. So I recognize that Detective Streebing testified that he was in the car with Ms. Williams and he listened to her phone while it was on speakerphone and he was supposedly able to identify this disembodied voice on speakerphone as being Donnell. Well, one, the jurors were not given those recordings to listen to. They weren't able to listen to this over here and say, yes, Donnell's voice sounded like that on the one in his police interview. And also Detective Streebing, the call was on January 7th. He didn't actually gain personal knowledge of Donnell's voice until January 27th. So his testimony that he was able to identify a voice three weeks after the fact, it would have reaped of confirmation bias to the jurors. And that would have been all the more apparent as Detective Streebing didn't testify that there was even anything distinctive about this voice. He didn't say, well, it was high pitched. He had a drawl or, you know, he had to clear his throat a lot. He just said, yes, that was him. This was not the type of corroboration needed to substantiate the inherently suspect testimony from Ms. Williams. And that is what made counsel's testimony prejudicial. And I think that this all goes into what I would consider my final point is that the prejudice in this case from counsel's deficiencies, it wasn't A to B. It wasn't just that the failure to file the motion to suppress resulted in a conviction of count three and the deficient performance performance related to other crimes evidence resulted in the conviction on count one. In multi-count trials, the charges aren't siloed off. There's not an evidentiary vacuum around them. And that was apparent, particularly in this case where there was an interrelationship between the charges. They synergized and they absolutely snowballed from one to the other. First, it snowballed from Donnell possessed drugs in apartment seven with the intent to deliver. Then he in fact acted on that and did deliver. And then into the jurors' consideration of whether Donnell was the puppet master behind Mr. Saimon. So if we put all the trial evidence, we step back and sort of put it in perspective. We start a little bit before trial because we counsels allow the jurors to know that Donnell was in trouble in the past. He'd wound up in prison because he was serving parole on January 7th. And then the day of they were allowed to know that he was taken into custody. And then we are, the jurors are allowed to know that he possessed supposedly possessed drugs in apartment seven with an intent to deliver them. If we remove that from the equation, and again, we look at what we are left, it is just inherently unreliable evidence. First, we've already discussed Ms. Williams' testimony and why it's subject to suspicion. But we also look at Mr. Saimon. He's a supposed co-conspirator in this case. He's the person who's most directly implicated in the vast majority of every criminal act that happened. Despite that fact, he's essentially off scot-free. He's living in Chicago. He's working at Papa John's while Mr. Taylor was sitting there in front of the jurors, taking the rap for Mr. Saimon. And so if we remove counsel's deficient performance from the equation and we look at what we're left, there's not, it is not really, it does not take much of a leap for us to see how the jurors' consideration would have been impacted and how counsel's deficient performance prejudiced Donnell. And so if this court has no further questions. I have one question. I know that you spoke to this earlier, but it kind of got past me, I'm entirely unclear as to your argument, why the giving of 3.14 was prejudicial to your client. Could you run over that again? Yes, I did, but I'd be happy to revisit it. So the, when the, when the seller left Sharon Williams' apartment, we don't know, well, we don't know what he looked like when he was in the apartment. The video that Ms. Williams caught with the button camera, that picture is very poor quality. That's in my brief. I'm not sure the exact page. When he left, we know that Sergeant Bialetto saw someone wearing dark pants. He mentioned nothing about the distinctive pants that had these cutouts in them that the state made a great deal of being at the gas station and also later on at the mall. And so while yes, the person wore a red sweatshirt, both exiting the apartment and at the mall and at the gas station, I think we have to look at the context of this case and remember that this is occurring in the middle of Bloomington and a red sweatshirt is not necessarily uncommon anywhere, but particularly in the home of the Redbirds. And so when we lack that clear identification at the time, and the state's presentation of the case demonstrates that evidence from the mall was essential to identify Donnell, it became critical and prejudicial when the jurors' consideration of that evidence was impacted by the knowledge that he'd been arrested on the day of the sale and that he was serving parole. Does that answer your question, Your Honor? It does. Thank you. Thank you. You will have rebuttal if you so desire. Mr. Williams, are you ready to proceed? I am, Your Honor. Thank you. May it please the court. Counsel, my name is James Ryan Williams, and it is my privilege to represent the state before this honorable court. So starting first with the motion to suppress issue, it's arguing that trial counsel rendered ineffective assistance for failing to file a motion to suppress, arguing that investigators failed to establish a sufficient nexus between his criminal activity and his apartment and their warrant application. That's that, however, is just simply not the case. So in this case, we have five different controlled buys. The first one involved defendant directly selling cocaine to the confidential source at her apartment before returning to his apartment at 1708 Springfield Road. During the second controlled buy, that doesn't directly link drugs to defendant's apartment, but it does introduce Mr. Simon or Seaman into the case, who's essentially defendant's co-conspirator in this drug distribution enterprise. Moving up, then you fast forward to the third controlled buy, and here this is arranged by Mr. Simon, and it was to a current defendant's apartment at 1708. The buy location was then changed to the neighboring building at 1714 Springfield Road. However, the confidential source, when she showed up, she actually went and stood and waited at 1718. While she's waiting, investigators see defendant leave his apartment, go to a jeep that's registered to his girlfriend and to apartment number seven, and then return to his apartment. After defendant returns to his apartment, Mr. Simon goes to that building, exits, and immediately goes and meets with the confidential source outside of 1718, where they then go inside the common area and sell cocaine. So in that instance, we have Mr. Simon going to defendant's building immediately before the transaction. Similarly, but the fourth controlled buy, Mr. Simon had directed the confidential source to the apartment complex on Springfield Road, but then was asked to meet at her place. Simon agrees, the transaction occurs there, and then immediately after, he goes and returns to the defendant's apartment and enters only briefly. Based on that, investigators were able to secure a surveillance warrant, which actually allowed them to put a camera outside of defendant's actual apartment door, and then that camera was able to observe Mr. Simon coming to the defendant's apartment. He then leaves, investigators observe him go do the controlled buy, and then approximately 30 minutes later, he returns to defendant's apartment. So essentially, the apartment building was involved in four of these five buys, and apartment number seven was specifically and clearly linked to the final buy. And in this argument, defendant seems to focus more on, you know, whether this was necessarily sufficiently linked to him in particular, but the warrant, of course, was for the search of apartment seven, which had a substantial nexus to, at a minimum, the final three controlled buys, because Mr. Simon either went to the apartment immediately before and or returned to the case, which admittedly is somewhat similar but easily distinguishable. That case involved three controlled buys. Two of the three happened merely in the vicinity of the defendant's home in that case, and then the third one involved just essentially the defendant leaving, or excuse me, the dealer leaving the defendant's home prior to the controlled buy, no indication that he returned thereafter. And that's simply not what we have here. Here again, defendant was directly involved in these. The final three directly involved the defendant's apartment, with the first indirectly involving his apartment because he returned there after. And then, of course, we have, unlike in the Manzo case, we have defendant and Simon having a close relationship in that they actually coordinated four of these five controlled buys with the, and then again, we have Simon actually visiting the department, the defendant's apartment, either immediately before or immediately after the final three controlled buys. So, based on that information, there was more than a reasonable probability that police would discover evidence of criminal wrongdoing in defendant's apartment. Mr. Wright, it seemed like to imply that it wasn't established that the apartment was defendant's. What's your response to that? Well, I guess my thought on that is if the apartment wasn't defendant's, then he'd have no standing to challenge the search of the apartment. If it was his or if he was staying there, he'd have standing to challenge the search of his apartment. And in any event, regardless of necessarily the connection to defendant himself with respect to the warrant at that time and the information known to the department, even if it wasn't directly linking defendant to that apartment, which in a couple of instances it did, it nevertheless was linking the apartment to the drug activity. And after all, the warrant authorized the search of the apartment. And admittedly, the warrant did further authorize a search of defendant upon his arrest. But in any event, this was a search of the apartment. And then, large amounts of money, other initial criminal activity. And so, again, in my opinion, it seemed like the briefing got a little bit askew in that it was focusing on necessarily connecting defendant to that apartment, which obviously the state did later at the trial. But regardless of that, there is a substantial connection between the criminal activity and the apartment because we have Mr. Simon going to this apartment and returning to this apartment, one or the other, or both, for the final three transactions. And very close in time, I should note. So, and it wasn't discussed today, but I mean, something else I want to make sure was clear in the briefing is a, what appears to me to be perhaps a clerical error in filing the exhibits relative to the two warrant applications. So, of course, here on January 25th, the court issued two different warrants. The first one was the surveillance warrant at approximately 3 p.m. And the second one was a subsequent search warrant. In the record on appeal, the fifth controlled by surveillance log, which was actually created because of the surveillance warrant, was apparently inadvertently included in the surveillance warrant application. That, of course, could not possibly have happened because the events that were covered in that fifth controlled by surveillance log were only observed after and basically thanks to the surveillance warrant itself. So, you know, unless this surveillance log is somehow time traveling back in time, it was, well, and the reality there is regardless, both of these warrants were before the court on January 25th. And so, this fifth controlled by surveillance log, which directly links the criminal activity to apartment 7 specifically, would have been before the court prior to the issuance of the search warrant. So, the suggestion in the briefing that that fifth controlled by surveillance log was not part of court's consideration in issuing the search warrant is a little bit of a misdirection. Like I said, obviously, I can't tell, but I suspect it was merely a clerical error in filing the exhibits. I think the surveillance log was just included in the exhibits with the wrong warrant application when it was filed. And then, of course, in any event, even if somehow this that supported the issuance of the search warrant itself, the officers here still had a good faith belief in the facial validity of that warrant. And at the end of the day, there's just simply no police misconduct to deter here. And then with respect to the other issue, the other crimes perhaps counsel didn't need to ask the follow-up question that elicited the passing reference to parole status. I mean, at the end of the day, there's not a reasonable likelihood that this passing reference to parole status was a material factor in the defendant's ultimate convictions here. Because as we just discussed, he was tied to essentially or he was tied to four of these controlled buys. Three of them directly involved the apartment that he was living in. His co-conspirator testified against him and corroborated cell phone extraction data. And then, of course, the defendant himself admitted that the cocaine that was possessed in the apartment was his. And so regardless of this passing reference, I don't think that there is a reason to argue that that was a material factor in his conviction. And the same with the giving of the IPI instruction. I mean, just to be perfectly real, the reality is that if that instruction wasn't given, we would be sitting here arguing about why it wasn't given. And even though it was given, we're arguing that it was prejudicial that it was given. So in any event, the giving of this instruction was going to be before this court. And at the end of the day, it's just simply not prejudicial. Because ultimately, it presumably would have been given in any event, if only in reference to the fact that he had a police encounter at the mall. So unless this court has any further questions. Counsel, I don't see any questions. Thank you. Is there any rebuttal? Just shortly, I won't belabor the facts. We've been through them and they're briefed. I would just like to first address the state's standing argument here. I have no concerns on the merits of standing. I think the record is clear. Counsel would have been able to file this motion. But given the state's reliance on it throughout the briefing and in its arguments to the court, I don't know if waiver or forfeiture is the more appropriate phrase here to use. Certainly some sort of affirmative action for the state to say they waived this argument, but at the very least, they didn't brief it and it's forfeited. As to the exhibits, the surveillance log and the police report from the January 25th transaction, the record is clear that the officer submitted a complaint for a surveillance warrant on January 25th at about 2.57 p.m. They placed the camera for about an hour and a half. After that, they went back and submitted an entirely new complaint for the warrant. There are two separate documents. There was no clerical error and our analysis here is limited to the document that Judge Workman signed at 6.40. Third, counsel referenced the data from the cell phone extraction to sort of corroborate the inherently unreliable testimony from Mr. Sammon and Ms. Williams. As I evidence was the fruit of the illegal search at Apartment 7, we should not consider that in evaluating the prejudice to Mr. Taylor. I have a question I'd like to raise. Yes, your honor. Was there any evidence in the record that the defendant resided anywhere else than at Apartment 7, 1708 Springfield Road? There is no evidence as to his residency. Well, let me put it this way. If there's evidence that he resided in this apartment and there's other evidence that he was involved in multiple drug sales, either individually or with others, why isn't that just by itself sufficient to establish probable cause that there's reason to believe, probable cause to believe, that he has drugs in his residence and the police should be able to search and see if they're there. To answer your question, and I think what I'll do is I'll sort of dovetail into a comment that counsel made earlier. First, um, the mere fact that the officers didn't include sort of information about Mr. Taylor's residency in the affidavit doesn't automatically imply that it that is to the exclusion of all other residences in the world and he automatically lives at Apartment 7. Was there any evidence in this record that he lived anywhere else? Yes, your honor. There is trial evidence linking Mr. Taylor to Apartment 7. He was there at 5 30 in the morning when they executed the warrant, which would at the very least be a strong inference of house guest status. Was there any evidence in this record that he lived anywhere else? Not, yes. I believe they're one of the, if my recollection serves correctly, one of the documents found at the scene listed a different mailing address for Mr. Taylor. I don't have that note in front of me. Let me go back to my initial question. If the police have reason to believe the suspect is involved in multiple drug sales and he lives at a certain address, why isn't that enough for the police to get a search warrant to think that there's probable cause to believe that the drugs he's selling are going to be found where he lives? Because even in the information based on the warrant, they've never seen Mr. Taylor inside Apartment 7. That's the question I asked you. I'm asking you a general question. Forget about this case. I'm just talking about generally. The police have a suspect who's involved in multiple drug sales. They have him living at a particular residence. Why isn't that enough to get a search warrant on the basis that there's probable cause to believe that the drugs he's selling will be in his residence? Well, that would be the critical thing, right, Your Honor, if we're looking at this broadly and stepping back just as a general matter. If the police had identified one of the actors in this case as having control over the premises or residing there, that certainly would have been a critical fact going towards establishing probable cause. You haven't answered my question, Mr. Wright. I'll ask it again. The police have reason to believe a certain person is involved in multiple drug sales and they have an address at which they believe he lives. Why isn't that enough to get a search warrant on the basis there's probable cause to believe that the drugs he's selling will be found at his residence? In Manzo, there was indicia of residence for both the target and the defendant, and our Supreme Court found that that warrant was based on an insufficient showing of probable cause and warranted suppression. So I would simply say that you need more than just surmising conjectures to residence, which is what we had here. If there are no further questions, Your Honor, I would yield back to the court, I suppose. Justice Steinman? No questions. Okay. Well, thanks to both of you for your arguments. The case is now submitted and the court will stand in recess.